# UNITED STATES DISTRICT COURT

## DISTRICT OF SOUTH DAKOTA

## SOUTHERN DIVISION

| | |
|---|---|
| LORI JEAN FRENCH,<br><br>                      Plaintiff,<br><br>        vs.<br><br>ANDREW M. SAUL, Commissioner of<br>the Social Security Administration,<br><br>                    Defendant. | 4:19-CV-04127-VLD<br><br><br>MEMORANDUM OPINION<br>AND ORDER |

## INTRODUCTION

Plaintiff, Lori Jean French, seeks judicial review of the Commissioner's final decision denying her application for social security disability benefits under Title II of the Social Security Act.[1]

---

[1]SSD/DIB benefits are called "Title II" benefits and SSI benefits are called "Title XVI" benefits. Receipt of both forms of benefits is dependent upon whether the claimant is disabled. The definition of disability is the same under both Titles. The difference--greatly simplified--is that a claimant's entitlement to SSD/DIB benefits is dependent upon one's "coverage" status (calculated according to one's earning history), and the amount of benefits are likewise calculated according to a formula using the claimant's earning history. There are no such "coverage" requirements for SSI benefits, but the potential amount of SSI benefits is uniform and set by statute, dependent upon the claimant's financial situation, and reduced by the claimant's earnings, if any. There are corresponding and usually identical regulations for each type of benefit. See e.g. 20 C.F.R. §§ 404.1520 and 416.920 (evaluation of disability using the five-step procedure under Title II and Title XVI). Ms. French filed her application for Title II benefits only. AR152. Her coverage status for SSD benefits expires on December 31, 2021. AR17. In order to be entitled to SSD benefits, Ms. French must prove disability on or before that date.

Ms. French has filed a complaint and has moved the court to reverse the Commissioner's final decision denying her disability benefits and to remand the matter to the Social Security Administration for an award of benefits or for further proceedings.  See Docket Nos. 1 & 15.  The government requests the Commissioner's decision be affirmed.  See Docket No. 17.

This appeal of the Commissioner's final decision denying benefits is properly before the court pursuant to 42 U.S.C. § 405(g).  The parties have consented to this magistrate judge handling this matter pursuant to 28 U.S.C. § 636(c).

## FACTS[2]

### A.  Procedural Recap

On November 13, 2016, Ms. French filed a Title II application for disability and disability insurance benefits, alleging disability beginning on August 27, 2014.  AR152-53.  Ms. French has past relevant work as a waitress and optometric technician.  AR337.  The Commissioner denied Ms. French's claim initially on July 5, 2017, and again on reconsideration September 14, 2017.  AR108-12, 119-25.  On September 21, 2017, Ms. French filed a written request for hearing.  AR126-27.

On June 15, 2018, an administrative law judge (ALJ) held a video conference hearing.  AR32-81.  On October 1, 2018, the ALJ issued a decision that was unfavorable.  AR12-26.  On May 28, 2019, the Appeals Council denied

---

[2] These facts are recited from the parties' stipulated statement of facts (Docket No. 14).  The court has made only minor grammatical and stylistic changes.

Ms. French's request for review of the ALJ's decision. AR1-4. Upon exhausting her administrative remedies, Ms. French timely filed this action pursuant to 42 U.S.C. § 405(g).

**B. Medical Facts**

On August 27, 2014, Ms. French injured her left elbow while working as an optometric technician at Vision Care Associates in Sioux Falls, South Dakota. AR544-45, 697. After pain in her left arm did not improve for several weeks, Ms. French sought treatment from Travis Slaba, PA, at Avera Family Medicine Clinic on September 9, 2014. AR544-45. Travis Slaba, PA, prescribed naproxen and Tramadol. AR545. He also placed her left arm in a sling. Id. On September 23, 2014, Ms. French returned to Travis Slaba, PA. AR540-41. He continued her medications and added nortriptyline. AR541.

On October 21, 2014, Travis Slaba, PA, referred Ms. French to Dr. Scott McPherson at CORE Orthopedics. AR526. On November 4, 2014, Ms. French met with Dr. McPherson. AR361. His diagnosis was left lateral elbow contusion with resultant lateral epicondylitis and left radial tunnel syndrome. AR361. Dr. McPherson gave Ms. French an elbow injection and implemented a 10 pound lifting restriction. AR361.

Ms. French returned to Dr. McPherson on November 25, 2014. AR360. Ms. French reported less tenderness and pain in her upper left extremity. Id. Dr. McPherson then released her to full work duty. Id. He also wanted her to follow up with him in a month. Id.

Ms. French returned to Dr. McPherson on December 22, 2014, complaining of intermittent pain symptoms in her left upper extremity, but reported overall she felt somewhat better. AR358. She stated she occasionally noticed a click, but Dr. McPherson did not elicit any clicking with motion. AR358. Dr. McPherson stated Ms. French had minimal symptoms over the radial tunnel level. AR358. Dr. McPherson recommended they monitor her progress and have Ms. French return in two months. Id.

Ms. French returned to Dr. McPherson on January 7, 2015, complaining of acute pain that caused trouble using her left upper extremity. AR357. Ms. French reported she had started a new position as a technician for an ophthalmologist. AR357. Dr. McPherson prescribed a Medrol dose pack along with a cockup splint for nightwear and H-wave therapy. Id. He also prescribed hydrocodone for use with more intense breakthrough pain. Id.

Ms. French returned to Dr. McPherson on January 14, 2015, complaining of some pain and discomfort in the lateral elbow and forearm region. AR356. She had changed employers. Id. Ms. French stated she had experienced some improvement with H-wave therapy, occupational therapy and activity precautions. Id. Dr. McPherson recommended that Ms. French continue with the H-wave therapy and occupational therapy. Id. Dr. McPherson stated Ms. French could continue with intermittent use of anti-inflammatory agents and Tylenol for pain control. Id. He also recommended work restrictions that Ms. French avoid forceful gripping, grasping or stressful use of her left upper extremity along with a 10 pound lifting restriction. Id.

On March 25, 2015, Ms. French went back to Dr. McPherson with similar complaints of left upper extremity pain. AR355. At this visit, Dr. McPherson injected her left lateral epicondyle region with 1.5 cc of Celestone, 1.5 cc of lidocaine and 1.5 cc of Marcaine. Id.

Ms. French returned to Dr. McPherson on May 8, 2015, for increasing pain in her left arm which was disrupting her sleep. AR354. Dr. McPherson recommended that Ms. French have surgery on her left elbow. Id. He proposed to perform a left lateral epicondyle release combined with a left radial tunnel decompression. Id.

Ms. French returned to Dr. McPherson on May 22, 2015, and June 15, 2015, with similar complaints. AR351-53. Because Ms. French had exhausted all conservative treatment options, Dr. McPherson scheduled her surgery for June 17, 2015. Id. On June 17, 2015, Dr. McPherson performed a left radial tunnel decompression and left lateral epicondyle release with partial lateral epicondyle ostectomy. AR362.

Following surgery, Ms. French followed up with Dr. McPherson on June 29, 2015. AR350. Dr. McPherson prescribed a Medrol dose and Neurontin. Id. He also recommended that she start therapy and remain off work. Id.

On July 13, 2015, Ms. French saw Dr. McPherson complaining of lack of range of motion and pain. AR349. Ms. French stated her pain had improved to the point she was able to use her hand and grip and grasp things. Id. Dr. McPherson stated there were gains yet to be made with range of motion and strength, but motor and sensations were intact. Id. Dr. McPherson

indicated she should continue with occupational therapy and that if her sympathetic overtone continued she might benefit from stellate ganglion blocks.  Id.

Dr. McPherson saw Ms. French on July 20, 2015, for perioral type symptoms.[3]  AR348.  Dr. McPherson recommended she seek advice from her primary care provider for that complaint.  Id.  Regarding her left arm, Dr. McPherson recommended stellate nerve blocks in conjunction with occupational therapy.  Id.

On July 24, 2015, Ms. French had herpes zoster and reported burning pain over her surgical site.  AR347.  Ms. French had been set up for stellate ganglion blocks but had not had them yet.  Id.  Dr. McPherson explained the treatment for chronic pain.  Id.  He prescribed Vitamin C, Capsaicin cream, Celebrex, and Norco.  Id.  Dr. McPherson also indicated that Ms. French was to remain off work and continue occupational therapy.  Id.

Ms. French returned to Dr. McPherson on August 13, 2015, complaining of increasing sympathetic tone of the left arm with burning, stinging sensation over the surgical site.  AR346.  On examination, Ms. French had light touch sensitivity over the surgical site.  Id.  The surgical side was healing well.  Id.  Dr. McPherson discontinued Celebrex and the lidocaine patch and instead prescribed a Medrol dose pack.  Id.  He also recommended that Ms. French

_____

[3] "Perioral" is defined as "of, relating to, occurring in, or being the tissue around the mouth."  See Merriam-Webster Dictionary, *Perioral*, https://www.merriam-webster.com/medical/perioral.  All internet citations in this opinion last accessed March 9, 2020.

continue with the stellate ganglion blocks with Dr. Lockwood and continue with occupational therapy.  Id.

Dr. Lockwood performed left stellate ganglion blocks on Ms. French's left arm on August 11, August 13, August 14, August 17, and August 26, 2015.  AR462, 457, 451, 445, 439.

On August 26, 2015, and September 16, 2015, Ms. French returned to Dr. McPherson after Dr. Lockwood performed these stellate ganglion blocks.  AR344-45.  Dr. McPherson stated that Ms. French seemed to note some decrease in the intensity of her pain symptoms (AR345) and some improvement in range of motion (AR344).  Dr. McPherson's impression remained of left lateral epicondylitis radial tunnel syndrome, surgically treated with chronic regional pain.  AR345.  Dr. McPherson referred Ms. French to Dr. Metz for further treatment.  AR344.  Dr. McPherson stated they might have to go quite slowly, but he encouraged her to get back to meaningful employment.  Id.

Ms. French went to Dr. Metz on September 22, 2015.  AR434.  Dr. Metz assessed Ms. French with complex regional pain syndrome of the left upper extremity.  Id.  Dr. Metz recommended placement of a trial spinal cord stimulator following a psychological evaluation.  AR435.

Dr. John Cook of Dakota Dunes Midwest Pain Clinic referred Ms. French to Donald E. Baum, PhD, for a psychological evaluation prior to a possible neurostimulator implant.  AR373.  On January 22, 2016, Dr. Baum interviewed Ms. French and also administered the Minnesota Multiphasic Personality Inventory 2, Beck Depression Inventory 2d Ed., Beck Anxiety

7

Inventory and behavioral pain evaluation. AR373-91. Ms. French stated she was currently working as an eye technician 30+ hours a week. AR374. She stated she had many interests, but particularly enjoyed working out, swimming, traveling, and doing family things. Id. Dr. Baum indicated that Ms. French would benefit from the placement of a spinal cord stimulator and made three specific recommendations. AR377. He recommended Ms. French undergo cognitive psychotherapy treatment to lower her depression and anxiety symptoms in an effort to manage her chronic pain issues. Id. He recommended Ms. French undergo behavioral pain management to extinguish exaggerated symptomatic pain behaviors. AR378. Dr. Baum also recommend Ms. French learn desensitization and relaxation methods to reduce her stress and anxiety levels. Id.

On November 25, 2015, Ms. French sought treatment from Dr. Cook at the Midwest Pain Clinic. Dr. Cook recommended a trial spinal cord stimulator be implanted for pain reduction. AR580. In addition, Dr. Cook prescribed pain medications, topical creams, and performed an incisional peripheral nerve block of her left elbow with an ulnar peripheral nerve block on June 7, 2016. AR569, 572, 576, 589.

On January 26, 2016, Ms. French's occupational therapist stated she had 35 pounds right hand grip strength and 20 pounds left hand grip strength. AR395. Ms. French had shown improvement in tactile stimulus tolerance, as well as with activity of the arm. Id. The occupational therapist indicated

Ms. French did have limited strengths and function in using the arm and/or light/moderate or heavy use activity. Id. She was working. Id.

On June 7, 2016, Dr. Cook placed the spinal cord stimulator for a trial. AR610. On June 9, 2016, Ms. French had the spinal cord stimulator lead removed early because it was not working on the left side. AR600, 602. On September 20, 2016, Dr. Cook surgically inserted a new trial spinal cord stimulator lead. AR566. On September 23, 2016, Ms. French returned to Dr. Cook because the spinal cord stimulator was causing pain, burning, and stinging. AR615. Dr. Cook removed the trial stimulator on this date. AR617.

On October 20, 2016, Dr. Hain noted Ms. French had arm pain relieved with spinal stimulation. AR749. Dr. Hain placed the spinal cord stimulator. AR749.

On November 16, 2016, Ms. French returned to Dr. Cook complaining of right hip pain that radiated into her right leg. AR562. Dr. Cook did a lumbar epidural steroid injection of the L5-S1. AR563.

On December 5, 2016, Ms. French began counseling with Dr. Shelley Sandbulte for major depression and pain coping. AR798-839.

On December 14, 2016, Ms. French underwent a propofol infusion for migraines at the Midwest Pain Clinic. AR657. She also complained to Dr. Cook about tenderness over the spinal cord stimulator site. AR675.

On January 11, 2017, Ms. French returned to Dr. Cook, complaining of headaches which Ms. French believed was being caused by the spinal cord stimulator. AR679. Dr. Cook referred Ms. French to Dr. Hain. Id.

On March 3, 2017, Ms. French consulted with Dr. Christopher Janssen for the purposes of an independent medical evaluation/impairment rating. AR697. Ms. French had 100 degrees flexion in the left elbow, compared to 150 degrees on the right; 80 degrees pronation in the left elbow, compared to 90 degrees on the right; and 60 degrees supination in the left elbow, compared to 90 degrees on the right. AR699. Dr. Janssen opined that Ms. French experiences continual severe and debilitating pain as a result of the injury Ms. French suffered on August 27, 2014. AR707. In addition, Dr. Janssen also opined that Ms. French will continue to suffer from continual, severe, debilitating pain. Id. On May 1, 2017, Dr. Hain removed the spinal cord stimulator. AR747-48, 841-42.

On July 20, 2017, Ms. French began treatment with Dr. Flickema at Avera Integrative Medicine. AR1052-57. Dr. Flickema treated with acupuncture. Id.

From January 5, 2018, through June 7, 2018, Ms. French sought treatment from Dr. Cho at Midwest Pain and Rehabilitation. AR1130-79. She was treated with medication, injections and physical therapy. Id.

## C. State Agency Medical Consultant Opinions

On September 11 and 13, 2017, state agency medical consultants Jerry Buchkoski, Ph.D., and James Barker, M.D., reviewed the evidence and opined as follows:

a. Ms. French has severe medically determinable impairments of fibromyalgia, spine disorders, and osteoarthritis and allied disorders. AR100.

b.  Ms. French has pain symptoms.  AR102.

c.  Ms. French's medically determinable impairments can reasonably be expected to produce the individual's pain or other symptoms. Id.

d.  Ms. French's statements about the intensity, persistence and functionally limiting effects of her pain symptoms are not substantiated by the objective medical evidence alone.  Id.

e.  Ms. French has exertional limitations as follows (AR103):

    i.  She can occasionally (occasionally is cumulatively 1/3 or less of an 8 hour day) lift and/or carry (including upward pulling) 20 lbs.  Id.

    ii.  She can frequently (frequently is cumulatively 1/3 up to 2/3 of an 8 hour day) lift and/or carry (including upward pulling) 10 lbs.  Id.

    iii.  She is limited to "occasionally" using her left hand for hand controls.  Id.

    iv.  She does not have manipulative limitations.  AR104.

**D.    Testimony from the Hearing Before the ALJ**

Ms. French reported she experiences burning, stinging, stabbing pain in her left elbow constantly.  AR53.  Ms. French reported she continually experiences pain in her right hip, right shoulder and back at the site where the spinal cord stimulators were placed.  AR53.  She also experiences headaches related to her pain and medications.  Id.

David Perry, Ph.D., appeared at the hearing as a vocational expert ("VE").  AR72.  The VE indicated Ms. French's past work as an optometric technician was skilled sedentary work as generally performed in the national economy, but was light to medium work as Ms. French actually performed it.  AR337.

11

The VE indicated Ms. French's past relevant work as a waitress was semiskilled light work as generally performed, but medium work as actually performed.  Id.

The ALJ posed a series of hypothetical questions to the VE.  AR73-77.  In the first hypothetical question, the ALJ asked the VE to assume as follows:

> we do have an individual who we have an age split.  Part of the time she was under the age of 50, and now she's over the age of 50.  Our hypothetical individual has a high school education, and past work as described here today.  For our first hypothetical, if our individual is able to lift and/or carry 20 pounds occasionally, and 10 pounds frequently.  She cannot lift overhead.  Our hypothetical individual can sit for about six hours in an eight-hour work day, but will need an opportunity to be able to stand up and/or change position at her work station for approximately two to three minutes after sitting for an hour.  After using that opportunity, our hypothetical individual could return again to a seated position, and continue in the fashion for the remainder of the work day.  Our hypothetical individual can stand and/or walk combined for about six hours in an eight-hour work day.  She can never climb ladders, ropes, or scaffolds, but can occasionally climb ramps and stairs.  She can occasionally balance, stoop, kneel, and crouch, but can rarely, defined as 1% to 5% of the work day, crawl.  Our hypothetical individual can rarely, again defined as 1 to 5% of the work day, reach overhead with her left non-dominant upper extremity.  And she can frequently, but not constantly reach in other directions with her left non-dominant upper extremity.  Our hypothetical individual can frequently, but not constantly, engage in handling, fingering, and feeling with her left non-dominant upper extremity.  She should have no exposure to work around hazards such as unprotected heights, and fast and dangerous moving machinery.

AR73-74.  The VE testified the individual depicted in the first hypothetical was capable of past relevant work as an optometric technician as that job is generally performed (i.e. sedentary), but not as Ms. French actually performed it at the light/medium exertional level.  AR74-75.  The VE testified Ms. French could not perform her past work as a waitress.  AR74.

The second hypothetical kept the parameters of the first hypothetical but limited the person's lifting and carrying to 10 pounds occasionally and less than 10 pounds frequently; the VE indicated that the person was able to do past relevant work as an optometric technician at a sedentary level as described in the *Dictionary of Occupational Titles*. AR74-75.

The third hypothetical kept the parameters of the two prior hypotheticals but also added that the person would be limited to occasional reaching in front and laterally and occasional handling, fingering, and feeling with the left non-dominant upper extremity. AR75. Under the third hypothetical, the VE testified that the person would not be able to perform past relevant work as an optometric technician. Id. Under the third hypothetical, the VE testified that the person would not be able to perform any other jobs. AR76.

The VE testified that absenteeism and tardiness for medical appointments two to three times a week that would require being absent four to five hours on those occasions eliminates competitive employment. AR77.

**E.    The ALJ's Decision**[4]

The ALJ concluded at step one that Ms. French had engaged in substantial gainful activity from August 27, 2014, to January 2, 2015, but not

_____

[4] The parties' joint statement did not include a detailed description of the decision of the ALJ. This section of the recitation of facts is the court's own description.

from January 2, 2015, to the date of the hearing on June 15, 2018.[5]  AR17-18.

At step two, the ALJ found Ms. French suffered from the following severe medically determinable impairments:  complex regional pain syndrome, status post-left lateral epicondylectomy with partial ostectomy and radial tunnel release; degenerative disc disease, cervical and lumbar spine.  AR18.  The ALJ rejected Ms. French's testimony that she was recently diagnosed with arthritis in her right hand because there was no documentation in the record of a medically determinable impairment of her right hand.  AR18.   The ALJ also rejected Ms. French's asserted anxiety and depression as severe impairments because the ALJ found these conditions only minimally limited Ms. French's basic work activities.  AR19-20.

At step three, the ALJ found Ms. French did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

At step four, the ALJ concluded Ms. French had the following physical residual functional capacity (RFC):

> [T]he claimant has the residual functional capacity to perform a range of sedentary work as defined in 20 C.F.R. 404.1567(a). Specifically, she can lift and/or carry 10 pounds occasionally and less than 10 pounds frequently.  She cannot lift overhead.  The claimant can sit for about 6 hours in an 8-hour workday, but would need an opportunity to be able to stand up and/or change position at her workstation for approximately 2 to 3 minutes after sitting for an hour.  After using that opportunity, the claimant

---

[5]Ms. French does not take issue with this analysis, instead asking this court to find that she was entitled to benefits beginning "January 2, 201[5]."  See Docket No. 16 at p. 16.  Counsel for Ms. French wrote in his brief January 2, 201**7**, but that is not the date the ALJ found Ms. French's SGA ended.  The court assumes this to be a typographical error in counsel's brief.

could return again to a seated position and continue in that
fashion for the remainder of the workday. She can never climb
ladders, ropes, or scaffolds, but can occasionally climb ramps and
stairs. She can occasionally balance, stoop, kneel, and crouch,
but can rarely (defined as 1%-5% of the workday) crawl. The
claimant can rarely (defined at 1%-5% of a workday) reach
overhead with her left, non-dominant upper extremity, and she can
frequently, not constantly, reach in other directions with her left,
non-dominant upper extremity. The claimant can frequently, but
not constantly, engage in handling, fingering, and feeling with her
left, non-dominant upper extremity. She should have no exposure
to work around hazards, such as unprotected heights and fast and
dangerous moving machinery.

AR21.

In view of this RFC, the ALJ opined Ms. French could return to past

relevant work as an optometric technician. AR25. The ALJ clarified its opinion

was **not** that Ms. French could return to this job as she actually performed it—

which was at the light to medium exertional level. Id. However, the ALJ,

relying on the VE's opinion, concluded Ms. French could perform this job at the

level it is generally performed at, which required only a sedentary exertional

level. Id.

The ALJ's conclusion on this point led it to hold that Ms. French was not

disabled. A finding of not disabled having been made at step four of the

analysis, the ALJ did not proceed to any step five analysis. AR26.

## DISCUSSION

**A.    Standard of Review**

When reviewing a denial of benefits, the court will uphold the

Commissioner's final decision if it is supported by substantial evidence on the

record as a whole. 42 U.S.C. § 405(g); Biestek v. Berryhill, 589 U.S. ___, 139 S.

Ct. 1148, 1154 (2019); Minor v. Astrue, 574 F.3d 625, 627 (8th Cir. 2009). Substantial evidence is defined as more than a mere scintilla, less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support the Commissioner's conclusion. Biestek, 139 S. Ct. at 1154; Richardson v. Perales, 402 U.S. 389, 401 (1971); Klug v. Weinberger, 514 F.2d 423, 425 (8th Cir. 1975). "This review is more than a search of the record for evidence supporting the [Commissioner's] findings, and requires a scrutinizing analysis, not merely a rubber stamp of the [Commissioner's] action." Scott ex rel. Scott v. Astrue, 529 F.3d 818, 821 (8th Cir. 2008) (cleaned up).

In assessing the substantiality of the evidence, the evidence that detracts from the Commissioner's decision must be considered, along with the evidence supporting it. Minor, 574 F.3d at 627. The Commissioner's decision may not be reversed merely because substantial evidence would have supported an opposite decision. Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993); Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005). If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Commissioner must be affirmed. Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993). "In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record." Mittlestedt v. Apfel, 204 F.3d 847, 851 (8th Cir. 2000) (citations omitted).

The court must also review the decision by the ALJ to determine if an error of law has been committed. Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992); 42 U.S.C. § 405(g). Specifically, a court must evaluate whether the ALJ applied an erroneous legal standard in the disability analysis. Erroneous interpretations of law will be reversed. Walker v. Apfel, 141 F.3d 852, 853 (8th Cir. 1998) (citations omitted). The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court. Smith, 982 F.2d at 311.

**B.    The Disability Determination and the Five-Step Procedure**

Social Security law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do his previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

The ALJ applies a five-step procedure to decide whether an applicant is disabled. This sequential analysis is mandatory for all SSI and SSD/DIB applications. Smith v. Shalala, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R. § 404.1520. The five steps are as follows:

**Step One**: Determine whether the applicant is presently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). If the applicant is engaged in substantial gainful activity, he is not disabled and the inquiry ends at this step.

**Step Two**: Determine whether the applicant has an impairment or combination of impairments that are *severe*, i.e. whether any of the applicant's impairments or combination of impairments significantly limit his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). If there is no such impairment or combination of impairments the applicant is not disabled and the inquiry ends at this step. NOTE: the regulations prescribe a special procedure for analyzing mental impairments to determine whether they are severe. Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992); 20 C.F.R. § 1520a. This special procedure includes completion of a Psychiatric Review Technique Form (PRTF).

**Step Three**: Determine whether any of the severe impairments identified in Step Two meets or equals a "Listing" in Appendix 1, Subpart P, Part 404. 20 C.F.R. § 404.1520(d). If an impairment meets or equals a Listing, the applicant will be considered disabled without further inquiry. Bartlett v. Heckler, 777 F.2d 1318, 1320 n.2 (8th Cir. 1985). This is because the regulations recognize the "Listed" impairments are so severe that they prevent a person from pursuing any gainful work. Heckler v. Campbell, 461 U.S. 458, 460, (1983). If the applicant's impairment(s) are *severe* but do not meet or equal a *Listed impairment* the ALJ must proceed to step four. NOTE: The "special procedure" for mental impairments also applies to determine whether a severe mental impairment meets or equals a Listing. 20 C.F.R. § 1520a(c)(2).

**Step Four**: Determine whether the applicant is capable of performing past relevant work (PRW). To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, (even those that are not *severe)* to determine the applicant's residual functional capacity (RFC). If the applicant's RFC allows him to meet the physical and mental demands of his past work, he is not disabled. 20 C.F.R. §§ 404.1520(e); 404.1545(e). If the applicant's RFC does not allow him to meet the physical and mental demands of his past work, the ALJ must proceed to Step Five.

**Step Five**: Determine whether any substantial gainful activity exists in the national economy which the applicant can perform. To make this determination, the ALJ considers the applicant's RFC, along with his age, education, and past work experience. 20 C.F.R. § 1520(f).

## C.    Burden of Proof

The plaintiff bears the burden of proof at steps one through four of the five-step inquiry.  Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994); Mittlestedt, 204 F.3d at 852; 20 C.F.R. § 404.1512(a).  The burden of proof shifts to the Commissioner at step five.  Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Clark v. Shalala, 28 F.3d 828, 830 (8th Cir. 1994).  "This shifting of the burden of proof to the Commissioner is neither statutory nor regulatory, but instead, originates from judicial practices."  Brown v. Apfel, 192 F.3d 492, 498 (5th Cir. 1999).  The burden shifting is "a long standing judicial gloss on the Social Security Act."  Walker v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987).  Moreover, "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five."  Stormo v. Barnhart 377 F.3d 801, 806 (8th Cir. 2004).

## D.    The Parties' Positions

Ms. French asserts the Commissioner erred in concluding she could return to past relevant work as an optometric technician.  See Docket No. 16 at pp. 12-15.  Ms. French also asserts the ALJ erred by concluding she could perform other jobs in the national economy.  Id. at pp. 15-16.  The Commissioner asserts the ALJ's decision is supported by substantial evidence in the record and should be affirmed.

## E. Whether the Record Shows Ms. French Can Perform Past Relevant Work as an Optometric Technician as Generally Performed

### 1. Clarification of the Issue

Given the RFC the ALJ determined for her, the ALJ concluded Ms. French could not return to work as an optometric technician as she had actually performed that job, which was at the light/medium exertional level. However, the ALJ decided Ms. French *could* perform that past relevant work as it is generally performed, which is at the sedentary exertional level. Ms. French alleges this conclusion is not supported by substantial evidence in the record.

Ms. French's argument mixes several legal issues and confuses several facts. For example, her counsel appears to assert the ALJ adopted the physical RFC opinion that she could lift 20 pounds occasionally and 10 pounds frequently. See Docket No. 16 at p. 13 (top of the page) (plaintiff's initial brief). The ALJ did ***not*** adopt this RFC.

Instead, the ALJ held Ms. French could lift and carry *10 pounds* occasionally and less than 10 pounds frequently. AR20. The 20-pound RFC opinion is recited in the state agency opinions (see AR90, 103), but the ALJ gave only "some weight" to these opinions because they were rendered prior to the addition in the record of later medical evidence supporting greater limitations. AR24. Thus, the ALJ declined to adopt in toto these RFC opinions. Id.

Ms. French's counsel further compounds the confusion by arguing that "the RFC actually limited Mrs. French's use of her left upper extremity to 'occasionally.'" See Docket No. 16 at p. 13. Again, counsel is confusing the

state agency RFC opinions with the ALJ's *own* conclusion regarding RFC. The ALJ, in fact, found that Ms. French had the physical RFC to do the following with her left upper extremity: reach overhead rarely, frequently reach in other directions, and frequently engage in handling, fingering and feeling. AR21. The state agency physicians, whose opinions the ALJ did not fully credit, opined Ms. French had *no* manipulative limitations (AR91, 104), and could only occasionally push and pull (AR90, 103).

The real issue, not so clearly articulated by Ms. French's counsel, is *not* whether the ALJ strictly followed the state agency opinions of RFC. Rather, the question is whether *the ALJ's own formulation* of Ms. French's physical RFC is supported by substantial evidence in the record.

### 2. Law Applicable to the RFC Determination

As is clear from the discussion below, the RFC formulation is not determined by a state agency consultant or any one medical source but rather is the exclusive province of the ALJ to determine. Residual functional capacity is "defined as what the claimant can still do despite his or her physical or mental limitations." Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001) (citations omitted, punctuation altered). "The RFC assessment is an indication of what the claimant can do on a 'regular and continuing basis' given the claimant's disability. 20 C.F.R. § 404.1545(b)." Cooks v. Colvin, 2013 WL 5728547 at *6 (D.S.D. Oct. 22, 2013). The formulation of the RFC has been described as "probably the most important issue" in a Social Security case.

McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982), abrogation on other grounds recognized in Higgins v. Apfel, 222 F.3d 504 (8th Cir. 2000).

When determining the RFC, the ALJ must consider all of a claimant's mental and physical impairments in combination, including those impairments that are severe and those that are nonsevere.  Lauer, 245 F.3d at 703; Social Security Ruling (SSR) 96-8p 1996 WL 374184 (July 2, 1996).  Although the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on *all* the relevant evidence . . . a claimant's residual functional capacity is a medical question."[6]  Lauer, 245 F.3d at 703 (citations omitted) (emphasis added).  Therefore, "[s]ome medical evidence must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace."  Id. (citations omitted).

"The RFC assessment must always consider and address medical source opinions."  SSR 96-8p.  If the ALJ's assessment of RFC conflicts with the opinion of a medical source, the ALJ "must explain why the [medical source] opinion was not adopted."  Id.  "Medical opinions from treating sources about the nature and severity of an individual's impairment(s) are entitled to special

---

[6] Relevant evidence includes:  medical history; medical signs and laboratory findings; the effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication); reports of daily activities; lay evidence; recorded observations; medical source statements; effects of symptoms, including pain, that are reasonably attributable to a medically determinable impairment; evidence from attempts to work; need for a structured living environment; and work evaluations.  See SSR 96-8p.

significance and may be entitled to controlling weight.  If a treating source's medical opinion on an issue of the nature and severity of an individual's impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record, the [ALJ] must give it controlling weight."  Id.

Ultimate issues such as RFC, "disabled," or "unable to work" are issues reserved *to the ALJ*.  Id. at n.8 (emphasis added).  Medical source opinions on these ultimate issues must be considered by the ALJ in making these determinations, but such opinions are not binding on the ALJ, even when the opinion is rendered by a treating source.  Id.  Thus, Ms. French's counsel's understanding of the state agency opinion of RFC as binding is simply not the law.[7]

When writing its opinion, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence. . .  In assessing RFC, the adjudicator must . . . explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved."  Id.

Finally, "[T]o find that a claimant has the [RFC] to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which

---

[7] Ms. French's counsel's misconstruing of the law was continued in his reply brief where he continually refers to the state agency consultant's RFC opinion as "the RFC," failing to acknowledge that "the RFC" is the RFC determined by *the ALJ, not the state agency consultant.*  See Docket No. 18 at p. 2 (plaintiff's reply brief).

real people work in the real world." <u>Reed v. Barnhart</u>, 399 F.3d 917, 923 (8th Cir. 2005) (citations omitted, punctuation altered); SSR 96-8p 1996 WL 374184 ("RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis" for "8 hours a day, for 5 days a week, or an equivalent work schedule.").

### 3.    Application of the Law to the Facts of Ms. French's Appeal

Interpreting the gist of Ms. French's counsel's argument, it appears the real argument being asserted is that the ALJ's conclusion that Ms. French has the ability to frequently reach in directions other than overhead and frequently handle, finger and feel, all with her left upper extremity, is not supported by substantial evidence in the record.

Although the ALJ purported to give "some weight" to the state agency physical RFC opinions, with regard to Ms. French's left upper extremity, it appears the ALJ rejected those opinions altogether, at least with regard to Ms. French's left upper extremity. The agency consultants opined Ms. French could lift and carry 20 pounds occasionally and 10 pounds frequently. The ALJ said 10 pounds occasionally and less than 10 pounds frequently. The agency consultants said Ms. French could only "occasionally" push and pull. The ALJ concluded Ms. French could "frequently" reach. The agency consultants opined Ms. French had no manipulative restrictions. The ALJ concluded she was limited to "frequent" handling, fingering and feeling.

Other medical opinions of RFC in the record included multiple opinions from Ms. French's treating physician, Dr. Scott McPherson. Dr. McPherson

wrote work slips for Ms. French on several occasions addressing her ability to work. AR363-69. These were not formal opinions of Ms. French's physical RFC, but appear to be documentation Ms. French would be able to present to her employer to explain her absence from work. Id.

On November 4, 2014, Dr. McPherson wrote Ms. French should be limited to no lifting, no stressful grasping, gripping or torquing with her left hand, and only light or sedentary use of her left hand. AR369. On January 14, 2015, he wrote the same restrictions with the additional notation "continue light duty." AR368. On March 25, 2015, Dr. McPherson wrote the same restrictions as were imposed in January. AR367.

On June 29, 2015, Dr. McPherson excused Ms. French from work entirely until her next doctor's appointment. AR366. On July 13 and 24 and August 26, 2015, he continued Ms. French's no-work status until her next doctor's appointment. AR363-65. The last time Ms. French appears to have seen Dr. McPherson was September 15, 2015. AR344. At this time, Dr. McPherson referred Ms. French to Dr. Metz and/or to Dr. Brunz. Id. Dr. McPherson encouraged Ms. French to continue with occupational therapy, H-wave therapy, ultrasound, range of motion and to start stress loading her "arm to see if we can start on a work-hardening program depending on symptomatology. We may have to go quite slow, but I would encourage her to try to get back to meaningful employment." Id.

The ALJ considered Dr. McPherson's "return to work" slips as medical opinions, but it gave those slip opinions little weight. AR25. The ALJ

characterized the work slips as time-limited in nature—i.e. they were not opinions as to Ms. French's long-term RFC or ability to work. Id. As such, the ALJ found they represented temporary, not permanent, limitations imposed by Ms. French's left upper extremity impairment. Id.

On March 3, 2017, approximately one year and three months before the ALJ hearing, Ms. French had an independent medical exam with Dr. Christopher Janssen for the purpose of obtaining an impairment rating. AR697-707.[8] Dr. Janssen reviewed all of Ms. French's medical records to that date, including psychological records. AR700-05. He took an oral medical history from Ms. French. AR697-99. He then conducted a number of physical examinations of Ms. French. AR699-700.

Dr. Janssen found objective evidence in support of the diagnoses by multiple other physicians[9] that Ms. French suffers from complex regional pain syndrome in her left upper extremity. AR699-98, 705-06. Among these findings were mottled skin in the left upper extremity as compared to the right, soft tissue atrophy on the left as compared to the right (22.5 cm vs. 25 cm), dry skin on the left as compared to the right, objective diminished range of motion

---

[8] Dr. Janssen's notes state he explained to Ms. French that he would be sending a report of his examination of her "to the requesting client," but the report itself does not indicate who that client was. AR697. The evaluation with Dr. Janssen does not appear to have been a consultative examination purchased by the ALJ but, rather, an examination in support of a claim for workers compensation benefits.

[9] The other physicians who had agreed on this diagnosis include Dr. Hain, Dr. McPherson, Dr. Metz, and Dr. Lockwood. AR705.

and stiffness of the left as compared to the right,[10] and allodynia and hyperalgesia in the left elbow.[11]  AR699, 705.

Applying the American Medical Association Guides 6th Edition, Dr. Janssen found Ms. French met the diagnostic criteria for complex regional pain syndrome, noting the objective findings discussed above.  AR705.  In addition, Dr. Janssen stated there was no other diagnosis that better explained her objective signs and symptoms.  Id.  He noted Ms. French had had multiple treatments for her pain including occupational therapy, medications, nerve blocks, surgery, and spinal cord stimulation.  Id.

Dr. Janssen opined Ms. French had reached maximum medical improvement—that her condition was not expected to improve or change significantly.  AR706.  Again using the AMA Guides, Dr. Janssen gave Ms. French a 13-percent permanent upper extremity impairment rating and an 8-percent whole person impairment rating.  AR707.  Other than Ms. French's own description to Dr. Janssen of her functional limitations (AR697-99), Dr. Janssen did not give specific opinions regarding Ms. French's discrete RFC.  AR 697-707.  The ALJ does not mention Dr. Janssen's opinion at all in its opinion denying benefits.  AR15-26.  In her brief in this case, Ms. French's

_____

[10] Ms. French had 100 degrees of flexion on the left and 150 on the right.  She had 80 degrees of pronation on the left and 90 on the right.  She had 60 degrees of supination on the left and 90 on the right.  AR699.

[11] An article in The Lancet Neurology defines allodynia as pain from a stimulus that usually does not provoke pain.  The Lancet, Vol. 13, Issue 9, p. 924 (Sept. 1, 2014).  The article explains hyperalgesia is increased pain from a stimulus that usually provokes pain, but not the level of pain experienced.  Id.

counsel also fails to address the import of Dr. Janssen's opinion and the ALJ's failure to address it. See Docket No. 16.

The Commissioner, for his part, side-steps any in-depth analysis regarding the ALJ's formulation of the RFC. Instead, the Commissioner seizes upon Ms. French's counsel's apparent mistake or confusion about what, exactly, *was* the RFC and simply posits that the record supports the ALJ's conclusion.

The Commissioner does assert that the ALJ's finding regarding Ms. French's use of her left upper extremity was supported by evidence in the record, noting "reduced range of motion in the left arm, but that functional testing indicated she possessed full strength and intact motor coordination (AR23; *see* JSMF 21, 31)." See Docket No. 17 at p. 9 (Commissioner's brief in support of affirmance). The Commissioner also asserts Ms. French's activities of daily living ("ADLs") supported the ALJ's RFC determination, noting that she cares for her personal needs, cooks, works part-time, works out at the gym, vacuums, does laundry, and drives. Id. (citing AR 23-24).

If Ms. French is taking issue with the ALJ's RFC formulation, which the court understands her to be doing, it is insufficient for the Commissioner to merely cite to *the ALJ's own decision* as support for that RFC. The question is not solely whether the ALJ's opinion supports the RFC formulation, but rather whether *the record* contains substantial evidence supporting the ALJ's RFC. The Commissioner does not discuss Dr. Janssen's opinion or the treating records or opinions of any other medical source.

The ALJ in its opinion in the passage cited to by the Commissioner wrote: "The objective medical evidence is not completely consistent with, nor does it fully support, the claimant's allegations regarding the intensity of the limiting effects of the impairment affecting her left arm. The record does support some limitation in range of motion due [sic] in the left upper extremity. However, the most recent functional testing indicates that the claimant possessed full strength and intact motor coordination. (see, e.g. Ex. 2F/6; Ex. 3F/54)." See AR 23.

The two exhibits cited by the ALJ do not support the ALJ's assertion that Ms. French "possessed full strength and intact motor coordination." Exhibit 2F at page 6 is a July 13, 2015, record from Dr. McPherson. See AR349. On that date, Dr. McPherson was evaluating Ms. French after she had undergone surgery on her left upper extremity for "radial nerve decompression with lateral epicondyle release and partial ostectomy on 06-17-2015." Id. Dr. McPherson noted Ms. French was having neuropathic pain in the lateral epicondylar region, but did experience improvement in that she was now able to grip and grasp things with her left hand. Id. She was still having stiffness and inablility to fully extend or flex her elbow. Id. Dr. McPherson noted she had gains yet to be made in terms of range of motion and strength in her left upper extremity— i.e. she was impaired in terms of range of motion and strength. Id. He kept her on a "no work" status at this time and referred her to occupational therapy to work on range of motion and to prevent permanent stiffness. Id. Nowhere in this record does Dr. McPherson state Ms. French had "full strength and intact

motor coordination" as quoted by the ALJ in its opinion.  Compare AR23 with AR349 (Ex. 2F/6).

Nor does the other record cited by the ALJ contain that language. Exhibit 3F at page 54 is dated October 5, 2015, and is Ms. French's physical therapy discharge note.  AR425.  The substance of this record, in its entirety, reads as follows:

> Treatment dates:  Patient was seen for 6 visits between initial evaluation on 8/28/15 and last visit on 9/17/15.
>
> Treatment Summary:  Patient was seen for aquatic therapy due to neck and shoulder pain after undergoing left lateral epicondylectomy and radial tunnel release.  She performed gentle [range of motion] exercises for neck and upper extremities as she was able to tolerate.  She was seen by OT for therapy for her left elbow.
>
> Discharge Plans:  Spoke with Stephan Kulzer, OT, CHT, working with [Ms. French], on 9/25/15.  He reported that patient was waiting for approval to have Dr. Mertz do a more permanent nerve block.  She was going to continue with pool exercises on her own.

AR425.  Not only does this medical record fail to state that Ms. French's strength and motor coordination were "full" or "intact" as the ALJ represented, but the record indicates to the contrary that Ms. French's problems with range of motion and pain were ongoing and unresolved.  Id.  To the extent the Commissioner in this appeal relies on the statement of the ALJ in its opinion at AR23 to support the RFC formulation, that does not supply substantial evidence.  The underlying documents cited in the opinion also do not support the ALJ's assertion.

Finally, the court notes the ALJ was quite wrong in characterizing these two records from 2015 as the "most recent functional testing" applicable to

Ms. French's left upper extremity. After October 5, 2015, Ms. French sought treatment from Dr. Cook at a pain clinic who performed four more surgeries on Ms. French on June 7 and 9, 2016; September 23, 2016; and October 20, 2016, implanting and removing spinal cord stimulators and different leads to try to relieve her left upper extremity pain. See AR566, 569, 572, 576, 580, 589, 615, 749. On January 26, 2016, Ms. French's occupational therapist documented a significant difference in the grip strengths of Ms. French's right and left hands. AR395.

Dr. Janssen performed his evaluation (described above) of Ms. French on March 3, 2017, which was also not discussed by the ALJ. Ms. French's spinal cord stimulator was removed on May 1, 2017, due to migraine headaches. AR679, 747-48, 841-42. Ms. French then began receiving acupuncture to try to address her left upper extremity pain. AR1052-57. From January to June, 2018, right up to the date of the ALJ hearing, Mr. French received treatment from Dr. Cho at Midwest Pain, who treated her with medication, injections and physical therapy. AR1130-79. So, not only were the two records cited by the ALJ not the "most recent" records as the ALJ characterized them, but the records which were subsequent to these two records showed a pattern of continuing substantial pain, weakness, and loss of range of motion.

The ALJ and the Commissioner also rely on Ms. French's ADLs to support the RFC formulation. AR23-24. But the ALJ often did not fairly characterize Ms. French's ADLs. For example, the ALJ stated Ms. French worked part-time for two years after the onset date, although her productivity

was less than that of other employees. AR24. In fact, the ALJ itself found Ms. French was engaged in SGA during only the first four months following the date of onset, not two years. AR17 (engaged in SGA from August 27, 2014, to January 2, 2015). In addition, one of Ms. French's co-workers submitted evidence that starting in 2015 Ms. French was only working at 50-percent capacity, evidence that Ms. French agreed with. AR49. Fifty-percent capacity is a little more significant than simply saying Ms. French's productivity "was less." AR24.

Although Ms. French does the grocery shopping, she can only lift one bag at a time with her right arm; her family helps carry in groceries. AR56. Ms. French testified she was not able to reach items on a shelf at the top of a coat closet. AR57. Ms. French testified she did most of her personal care using her right hand only. AR58. Ms. French stated she cannot hold a knife or lift a pot of water, so her family helps her with cooking duties. AR58-59. Ms. French can hold a pen and sign her name with her right hand, but it is a slow and laborious process that results in "a scribble." AR59-60. Ms. French testified she could not type on a keyboard using her left hand and had difficulty buttoning buttons and tying. AR61. Although she can vacuum, Ms. French testified she can "only do a certain amount of that" and then she has to stop because it hurts. AR61. Ms. French does laundry, but a family member has to carry the hamper to the laundry room. AR61-62.

The ALJ summarized, "[t]he claimaint's daily activities, in particular her ability to see to her personal cares independently, *work*, and exercise at a gym

32

5 days per week, are significant, and are more consistent with the residual functional capacity assessment" that the ALJ formulated. AR24. Ms. French's "working" post-onset-date is addressed above.

Her gym visits are recorded on a functional capacity form Ms. French filled out April 30, 2017, a time period when she was receiving aqua therapy for her arm in the pool. AR272, 275. She also noted on this form she can walk on a treadmill for 60 minutes at a time. AR273. The ALJ does not explain how 5 trips to the gym per week to walk and do aqua therapy establish the RFC for Ms. French to be able to "reach frequently" with her left upper extremity and to "frequently" handle, finger and feel with her left upper extremity. AR21.

Ms. French's counsel argues that the ALJ erred in concluding she could return to her past relevant work as an optometric technician. The Commissioner defends by arguing the ALJ's decision was based on a valid hypothetical to a VE and the VE's resulting opinion. The error did not lie in the VE's testimony nor in the hypothetical to the VE. Rather, the error was in the ALJ's formulation of the physical RFC for Ms. French's left upper extremity, which formed the basis for the hypothetical and the VE's testimony. Because the ALJ's formulation of Ms. French's physical RFC is not supported by substantial evidence in the record (as to her left upper extremity), the court must remand for all the reasons discussed above.

## F.    Step Five Analysis

Ms. French also argues that the ALJ cannot prove there are other jobs in the national economy which she is capable of performing. See Docket No. 16 at

pp. 15-16.  However, as noted above, because the ALJ concluded Ms. French

was conclusively not disabled at step four, the ALJ never proceeded to step five.

AR25-26.  Therefore, there is no discussion or analysis from the ALJ on the

issue of whether there are other jobs available in substantial numbers in the

national economy which Ms. French can perform.  The court will not embark

on that analysis *de novo*.  The court's job is to review the decision below and

determine whether it is supported by substantial evidence.  Because the ALJ

never made any step five determination, there is nothing for the court to

review.  Accordingly, the court rejects Ms. French's invitation to reverse based

on step five.

## G.      Type of Remand

For the reasons discussed above, the Commissioner's denial of benefits is

not supported by substantial evidence in the record. Ms. French requests

reversal of the Commissioner's decision with remand and instructions for an

award of benefits, or in the alternative reversal with remand and instructions

to reconsider her case.  42 U.S.C. §  405(g) governs judicial review of final

decisions made by the Commissioner of the Social Security Administration.  It

authorizes two types of remand orders: (1) sentence four remands and

(2) sentence six remands.  A sentence four remand authorizes the court to

enter a judgment "affirming, modifying, or reversing the decision of the

Secretary, with or without remanding the cause for a rehearing."  42 U.S.C. §

405(g).

A sentence four remand is proper when the district court makes a substantive ruling regarding the correctness of the Commissioner's decision and remands the case in accordance with such ruling. Buckner v. Apfel, 213 F.3d 1006, 1010 (8th Cir. 2000). A sentence six remand is authorized in only two situations: (1) where the Commissioner requests remand before answering the Complaint; and (2) where new and material evidence is presented that for good cause was not presented during the administrative proceedings. *Id.* Neither sentence six situation applies here.

A sentence four remand is applicable in this case. Remand with instructions to award benefits is appropriate "only if the record overwhelmingly supports such a finding." Id. at 1011. In the face of a finding of an improper denial of benefits, but the absence of overwhelming evidence to support a disability finding by the Court, out of proper deference to the ALJ the proper course is to remand for further administrative findings. Id., Cox v. Apfel, 160 F.3d 1203, 1210 (8th Cir. 1998).

In this case, reversal and remand is warranted not because the evidence is overwhelming, but because the record evidence concerning Ms. French's left upper extremity RFC should be clarified and properly evaluated. See also Taylor v. Barnhart, 425 F.3d 345, 356 (7th Cir. 2005) (an award of benefits by the court is appropriate only if all factual issues have been resolved and the record supports a finding of disability). Therefore, a remand for further administrative proceedings is appropriate.

**CONCLUSION**

Based on the foregoing law, administrative record, and analysis, this court hereby

ORDERS that the Commissioner's decision is REVERSED and REMANDED for reconsideration pursuant to 42 U.S.C. § 405(g), sentence four.

DATED March 10, 2020.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge